NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

13-P-1908                                    Appeals Court

     CARINE BELIZAIRE, administratrix,[1] vs.  DEBORAH A. FURR.


                      No. 13-P-1908.

     Suffolk.     October 15, 2014. - September 11, 2015.

        Present:  Kafker, C.J., Trainor, & Milkey, JJ.


Negligence, One owning or controlling real estate,
     Foreseeability of harm, Duty to prevent harm.  Landlord and
     Tenant, Execution of lease, Tenancy at will, Landlord's
     liability to third person.  Real Property, Lease.



     Civil action commenced in the Superior Court Department on
October 13, 2010.

     The case was heard by Heidi E. Brieger, J., on a motion for
summary judgment.


     Sheldon S. Ananian for the plaintiff.
     Richard E. Bennett for the defendant.


     KAFKER, C.J.  Carl Hentz Belizaire (the victim) was shot

and killed by an unknown assailant at a party held on September

19, 2009, in an apartment in a two-family building (the

───────────────────

     [1] Of the estate of Carl Hentz Belizaire.

property) owned by Deborah A. Furr (the defendant). The plaintiff, Carine Belizaire, as administratrix of the victim's estate, brought suit against the landlord claiming that she was negligent for failing to keep the property safe during the party. The defendant moved for summary judgment, and a Superior Court judge granted it. The plaintiff appealed. Because the plaintiff cannot establish essential elements of her negligence claim,[2] we affirm.

1. Background. Summary judgment is granted where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002). "When reviewing a grant of summary judgment we consider the pleadings, depositions, answers to interrogatories, and responses to requests for admission under Mass.R.Civ.P. 36, 365 Mass. 795 (1974), together with the affidavits." Federal Natl. Mort. Assn. v. Hendricks, 463 Mass. 635, 637 (2012). Our review of the summary judgment record is de novo. Miller v. Cotter, 448 Mass. 671, 676 (2007). We make all permissible inferences favorable to the nonmoving party, in this case the plaintiff, and resolve all disputes or conflicts in the summary judgment materials in her favor. Carey v. New

_____

[2] The complaint included a separate count labeled "wrongful death." The entire focus of the plaintiff's appellate argument, however, is on the negligence claim, and we discern no meaningful distinction between the two claims.

England Organ Bank, 446 Mass. 270, 273 (2006). We recount the facts with these requirements in mind.

A. Ownership of the property. On October 7, 1997, the defendant purchased the two-family property at 5-7 Edson Street in Dorchester. The defendant lived at 5 Edson Street from 1997 until 2007, when she moved to Brockton. While she lived at 5 Edson Street, several of her children resided with her, including her sons Thomas and John and her daughter Doreen. Throughout the history of her ownership of the property, the majority of the property's residents have been the defendant's children, their friends, and other family members of the defendant.

Of these residents, the defendant created formal, written lease agreements with only two: Latisha Waiters and Rasheda Adams. During her deposition, the defendant addressed the payment of rent regarding Waiters, Adams, and her children: Waiters was the defendant's tenant pursuant to the United States Department of Housing and Urban Development Housing Choice Voucher Program,[3] who left due to an increase in rent; Adams was evicted for nonpayment of rent; and the defendant had a "set-up" with her children to do work around the property "in exchange

---

[3] Commonly referred to as "Section 8." Figgs v. Boston Hous. Authy., 469 Mass. 354, 355 (2014).

for . . . a break on the rent."  During 2009, the defendant received only "sporadic" payments for rent at the property.

After Adams was evicted from 7 Edson Street in August of 2009, the defendant did not list the apartment for rent with a rental agency.  However, two weeks later, Andrew Korgenay[4] moved into the apartment.[5]  Korgenay is a friend of the defendant's family, as he had grown up with her son Willie, and both the defendant and her son John testified that they had known Korgenay for twenty years.  Though Korgenay had moved in, he did not have much furniture.  The defendant testified that she and Korgenay had an understanding that Korgenay would rent the apartment along with two roommates.  Korgenay had not found roommates by the time he vacated the apartment some three weeks later.  No evidence of rent paid, or even an agreement on a rental amount, was presented to the motion judge.

B.  <u>The night in question</u>.  John Furr, one of the defendant's sons, testified during his deposition that he cohosted with Korgenay the party that took place on September 19, 2009, at 5-7 Edson Street.  John testified that the occasion

---

[4] Korgenay's name is variously spelled "Korngay," "Kornegay," and "Korgenay" in the documents associated with this case.  We adopt the spelling "Korgenay" as used by the Superior Court judge in her memorandum of decision and order.

[5] The defendant testified that her son, Willie, told her that Korgenay was having difficulties with his girlfriend and wanted to rent a room at 7 Edson Street.

was intended to be a housewarming party for Korgenay, so both he and Korgenay "[c]alled a couple of people" to invite them to the party. According to John, the party "wasn't that big" and the attendees were comprised of their friends, many of whom were mutual. However, John testified that he did not know the victim or the two people who attended the party with the victim. He also did not know the three other individuals who were shot that evening at the party. Jennifer Washington, who attended the party and was deposed by the plaintiff, testified that she did not know John, Korgenay, or who threw the party. Washington testified that she was not invited by John or Korgenay.

Washington attended the party with her sister Virginia, and her friend Edwidge Doudiou. The three arrived at the property between 12:30 P.M. and 1:00 A.M. on the night in question. After parking, they walked to the back of the house and up some stairs, where a woman standing outside the door charged them five dollars each to enter. Washington had attended similar types of parties at other locations and stated that usually there was an admission fee to enter. The three paid the admission fee and entered the kitchen.

Upon entering the kitchen, Washington noticed a so-called "disc jockey" (DJ) in the corner. Though Washington could not say for sure whether the DJ was a professional, he was operating turntables. In the living room, where Washington estimated

there were forty to fifty people, she observed several large speakers that were nearly her height.[6]  She thought that no couches, tables, chairs, or other such furniture were present.  Washington stated that the alcohol was not free at the party -- she was "pretty sure" her sister paid for the drink she consumed, though Washington did not witness the exchange.

Roughly thirty minutes after Washington's arrival at the party, the victim and apparently three others were shot by an unknown assailant inside the apartment.  The victim died, and his sister, as administratrix of the victim's estate, brought the underlying suit, alleging that it was the defendant's negligence, as owner of the property, that caused the victim's death.

C.  Prior criminal history at the property.  Prior social gatherings at the property were limited to events like birthday parties and cookouts, and there was no evidence that any shootings or other related acts of violence ever took place at such gatherings.  The shooting of the victim was the only incident of gun violence ever to occur on the property.  There was one threat made with a gun approximately ten years prior to the victim's death, which appears to have involved persons

---

[6] Washington stated her height as five feet and eight inches, and that the speakers were roughly an inch shorter than her.

unrelated to this case.[7] The few other reports on record of violence at the property involved domestic disputes, again unrelated to this shooting.

2. Discussion. For the defendant "[t]o be liable for negligent conduct, [she] must have failed to discharge a duty of care owed to the [victim], harm must have been reasonably foreseeable, and the breach or negligence must have been the proximate or legal cause of the [victim's] injury." Christopher v. Father's Huddle Café, Inc., 57 Mass. App. Ct. 217, 222 (2003), citing Stamas v. Fanning, 345 Mass. 73, 75-76 (1962). See Jupin v. Kask, 447 Mass. 141, 146 (2006).

We begin our analysis with the issue of whether there was a tenancy in place. This distinction is important, because if a tenancy did exist, it limits the defendant's control over the premises and further attenuates her from the circumstances surrounding the victim's death. This substantially increases the plaintiff's burden in establishing that the defendant owed the victim a duty to protect against the criminal acts of third parties. See Griffiths v. Campbell, 425 Mass. 31, 34 (1997) (case law focuses on foreseeability of criminal conduct and landlord's ability to prevent that conduct); Luoni v. Berube, 431 Mass. 729, 732 (2000) (no special relationship obligates

---

[7] No gun was found in the police search of the apartment on that occasion.

homeowner to protect social guest from other guest's hazardous conduct), and cases cited.  See generally Restatement (Third) of Torts:  Liability for Physical and Emotional Harm § 53 (2012) (lessors owe duty of reasonable care to lessees and lawful entrants regarding premises that lessor controls).

A.  Korgenay's tenancy.  In her memorandum of decision and order, the motion judge concluded that "[a]t all relevant times, 7 Edson Street was orally leased to Andrew Korgenay."  The plaintiff argues that there was no oral lease and therefore no tenancy between the defendant and Korgenay, and that at all relevant times the property was under the defendant's exclusive control.

Under Massachusetts law, a tenancy at will may be created by an oral lease.  See J. W. Grady Co. v. Herrick, 288 Mass. 304, 309 (1934); Jones v. Webb, 320 Mass. 702, 703 (1947).  There are two essential requirements for the creation of such a tenancy:  first, a contractual agreement between the landlord and the tenant, and second, that the tenant exclusively occupy the premises.  See Central Mills Co. v. Hart, 124 Mass. 123, 125 (1878); Rogers v. Coy, 164 Mass. 391, 392 (1895); Williams v. Seder, 306 Mass. 134, 136 (1940).  The defendant emphasizes only the second requirement.  While "occupation by the tenant, with the assent of the landlord, is indispensable" to the creation of a tenancy at will, Milmore v. Landau, 307 Mass. 589, 591 (1940),

the contractual foundation of a tenancy at will cannot be ignored, see Commercial Wharf Corp. v. Boston, 208 Mass. 482, 489 (1911); Dennett v. Nesson, 244 Mass. 299, 301 (1923); Williams v. Seder, supra. As such, the tenant's occupancy of the premises must be "for a consideration -- usually the payment of rent." Siver v. Atlantic Union College, 338 Mass. 212, 216 (1958), quoting from Williams v. Seder, supra. While the payment of money is not a necessity, some form of consideration is required.

In the current case, there is little to "no evidence of any consideration for the granted privilege" of Korgenay's occupancy. Siver v. Atlantic Union College, supra. Instead it appears that there was an expectation that rent would be paid and a lease executed when Korgenay acquired roommates in the future. Korgenay also was a friend of the family, thereby providing a reasonable explanation for his presence on the property without consideration during the relevant time period, including on the night of the shooting. See ibid. Such a gratuitous arrangement does not create a tenancy at will. Compare Taylan Realty Co. v. The Student Book Exch., Inc., 354 Mass. 777, 778 (1968).

On this incomplete record, we conclude that summary judgment for the defendant on the ground that there was an oral tenancy is problematic, as a trial appears to be necessary to

resolve material issues of fact, particularly the question of consideration. However, even if there were no tenancy and the defendant retained control over the entire premises, we conclude that summary judgment in her favor still would be required.

B. The role of foreseeability. "As a general rule, a landowner does not owe a duty to take affirmative steps to protect against dangerous or unlawful acts of third persons." Luoni v. Berube, 431 Mass. at 731. The Supreme Judicial Court has, however, explained that in certain exceptional circumstances, "[l]andlords may be liable for ignoring criminal activities that occur on [their] premises and were known or should have been known to them." Griffiths v. Campbell, 425 Mass. at 34. More particularly, liability has been imposed in the rare cases "in which a person legally on the premises is attacked, and the owner or landlord knew of or should have known of both the previous attacks and the potential for a recurrence based on a failure to take measures to make the premises safer." Id. at 35. In these circumstances, the court has found that a "landlord or property owner may be liable for failing to prevent reasonably foreseeable criminal acts." Id. at 34. Compare Fund v. Hotel Lenox of Boston, Inc., 418 Mass. 191, 193-195 (1994) (summary judgment to defendants reversed because stabbing of hotel guest found to be within reasonably foreseeable risk of harm given numerous nonviolent crimes and occasional violent

crime in hotel, and inadequate security), with <u>Whittaker</u> v. <u>Saraceno</u>, 418 Mass. 196, 197 (1994) (judgment for plaintiff reversed; landlord of commercial office building could not be held liable for negligence for failing to prevent attack on woman who worked in office building because landlord could not have reasonably foreseen attack where no prior attacks had occurred).

In this context, the "word 'foreseeable' has been used to define both the limits of a duty of care and the limits of proximate cause." <u>Whittaker</u> v. <u>Saraceno</u>, <u>supra</u> at 198. As the court further explained, "As a practical matter, in deciding the foreseeability question, it seems not important whether one defines a duty as limited to guarding against reasonably foreseeable risks of harm or whether one defines the necessary causal connection between a breach of duty and some harm as one in which the harm was a reasonably foreseeable consequence of the breach of the duty." <u>Id</u>. at 198-199. We conclude that the "attack on the [victim] was not reasonably foreseeable. There was no evidence that the landlord knew or reasonably should have known that a physical attack might occur in the [property]." <u>Id</u>. at 200. Thus, the required elements, including a duty of care owed to the victim, have not been established here.

There was no evidence of prior shootings or similar violent incidents on the property. See <u>Griffiths</u> v. <u>Campbell</u>, 425 Mass.

at 34.  And though the plaintiff makes much of prior drug activity at the property, this is insufficient to support a finding of foreseeability.  Id. at 35 ("If we were to conclude that a homicide was reasonably foreseeable based on the failure of a [landowner] to act on a suspicion of illegal drug activity, we would be permitting inference upon inference to impose liability").  See Whittaker v. Saraceno, supra at 200 (incidents of malicious damage to and theft of vehicles and their contents did not mean physical attack on plaintiff was foreseeable).  There was not even evidence of other large parties with uninvited guests similar to the one in question taking place on the property.[8]  See id. at 200-201.

Nor was there any evidence that the defendant was affiliated in any way with, or knowledgeable about, the assailant or any dispute that the assailant may have had with the victim.  The evidence submitted to the motion judge suggests that the victim's death was tied to events beyond the party at the defendant's property.  In October of 2008, someone attempted to shoot the victim while he was alone in his car.  After that incident, the victim's mother sent him to live with relatives in Connecticut.  He returned to Boston in April of 2009.  In July

---

[8] The plaintiff relies on cases imposing liability on tavern keepers or restaurant owners.  The defendant here was neither. Contrast Christopher v. Father's Huddle Café, 57 Mass. App. Ct. at 222-226.  Hosting an occasional party is quite different.

of 2009, the victim's sister bought him a plane ticket to Haiti, where he stayed until his return to Boston on September 16, 2009, a mere three days before the party and his murder.  There is no evidence that the defendant knew about or was in any way associated with the assailant or the underlying dispute between the assailant and the victim, a guest.  Thus, we conclude that summary judgment was properly granted as the harm to the victim was not within the scope of foreseeable risk.  See Foley v. Boston Hous. Authy., 407 Mass. 640, 646 (1990); Whittaker v. Saraceno, supra at 200-201.

                              Judgment affirmed.